Good morning, Your Honors. My name is William M. Audette, and I represent, technically, my firm. I am not here objecting to the settlement, but I am here asking for review and reversal of the court's decision not to award our firm any fees based on the objections and modifications to the settlement. I was here today, and I'm excited to be back. I was here 30 years ago. I used to be a law clerk here, and I was walking through the hallway and remembering how beautiful this building is. And I also remember my introduction to Chief Judge Browning, and one of the things he said to the group, not just to me, was a good appellate brief speaks for itself and doesn't require another speaker, which means I'll keep my remarks very short. Welcome back. Thank you, Your Honor. I think my record rather than my advocacy speaks for itself, and I would just ask the court to look at the actual record itself, not the arguments, to find that there was a link between what we raised and what we asked the court to do and what we asked the parties to do, the plaintiffs and Wells Fargo to do, which two of the things they admitted they did. One of them they admitted in a document. And I can go through each one if Your Honor wants, but essentially I think our briefs do speak for themselves. Looking at it last night, I do think we supported them in the record. Let me ask you about one of your arguments. How is your argument that you helped improve the $25 million settlement fund here not waived? Because it seems like you raised that for the first time in a reply brief before the district court. Your Honor, I must admit it was raised in a reply brief, and I did find some cases that indicated when it's in response to an issue raised in an opposing brief, it's okay to raise it and not waive it in the reply brief, and I can find that case. But I believe we addressed that in our reply brief. But I will admit, Your Honor, it was really raised for the first time. I don't want to argue otherwise. Even assuming it's not waived, how does this warrant attorney's fees if the information about the number of unauthorized accounts was public information? That's correct, too, Your Honor. It was public information, but it didn't appear as if they were going to modify the settlement, if you look at the timeline, until after we wrote more than one letter asking them to add more money to, and we didn't say the reserve fund. I didn't think the $25 million was sufficient, but it was better than nothing. There were actually two monetary additions. There was the $25 million reserve fund, and then they raised it from $110 million to $140 million when more information came out that there was potentially another half a million potential class members, if not more, potentially in the class. I hope that answered the question. Okay, thank you. Court, do you have any other questions? I'm happy to answer my question. Hopefully you'll note I did, I guess I assumed I knew someone from the Seventh Circuit was coming. There's a lot of Seventh Circuit cases I cite in our briefs, so the Southwest case and the, what's the other one, Pella, the Pella case, two fundamental cases out of the Seventh Circuit. Right. So, I mean, since you are soliciting questions, I'll ask you one. And I'll start with my, because I do this on the district court, and my approach is as follows. Like, let's assume, you know, I go to the Bears game, and I'm in the front row, and the field goal kicker goes out into the field, and I yell out, you got to kick the ball between the uprights. You know, that's good advice. But I don't think I added anything that he didn't already know. So I couldn't claim any credit if he actually does kick the ball between the uprights, which is not a foregone conclusion with Bears field goal kickers at Soldier Field. But if he actually managed to do it, I can't say, and I am a participant in that successful action. And it's, you know, oftentimes the same thing happens with these class settlements, where not invariably but oftentimes the proposed settlement is not perfect. And maybe, you know, not casting any aspersions, maybe the plaintiff's lawyers are asking for more fees than they should be getting. Maybe the recovery isn't being allocated perfectly among the various subclasses. But a lot of that to a district judge is completely obvious. And I don't need somebody coming up and saying, oh, by the way, you know, this, that, and the other thing. And that's kind of, you know, the really obvious stuff is akin to me going to Soldier Field and telling the field goal kicker to kick the ball between the uprights. What did you do here that went beyond pointing out obvious deficiencies that would have occurred to any non-summulant district judge? Let me modify the way you pose that. I think if you were next to the quarterback and were yelling just before he went out on the field or telling them, hey, maybe you do the quarterback sneak, and he does the quarterback sneak, then I think you would have deserved some credit maybe in the paper for winning the game for the Bears, versus I didn't just yell out or tell them. Well, tell us what you did that was akin to, hey, the defense is set up in a certain way, and I think you need to do a quarterback sneak between the guard and the tackle. Yes. I mean, what did you do that was along those lines as opposed to kick the ball between the uprights? I think the best example is the extension of the class claims period. They originally started, it was going to be 120 days, and that was submitted to the court. I then wrote to the plaintiff's counsel and Wells Fargo. I didn't write to them always together, but I wrote to them, and I said, that has to be extended. And they actually then, to their credit, admitted that we were a factor in the change to that, and they made it from 120 days to 210 days. I'm saddened to hear today in their briefs they took it back a bit, but the record is clear if you look at the record. That's the best example. And, again, I credit them with admitting that, at least in the district court below. They have changed their mind a bit on appeal, unfortunately. That's probably the best example that I can bring. The reserve, I'll be the first to admit, it looks a little tougher. First, I've got the potential waiver issue, and then there were more people in the class. But if you look at the timeline and you really look at the record, as opposed to what people argue, what they argue on either side, you'll see that there is a timeline relationship between when I raised it and when they finally had a discussion with Wells to get more money. Now, you could argue, and they argue it, oh, well, we were going to do that anyways. But that standard's a bit high, and I don't think you'll end up in a situation where you ever, ever reward people from, or ever, ever give people a reward for coming forward and asking for changes. The other changes were made by the court, and those are trickier for me. Those were made not by the plaintiffs in Wells Fargo, but the court said, change this. Now, it was done after I filed a brief recommending these changes, and there is some case law that says just because the court did something doesn't mean credit isn't deserved to those that suggest it. That's a tougher one for me, but it's there in the record, as opposed to the advocacy, as opposed to the briefs filed by the plaintiffs. So hopefully I answered your question. Counsel, Judge Gould, if I could interject a question. I'm correct, am I not, that we have to review for abuse of discretion the court's decision with regard to your fees? That is the correct standard, Your Honor. Thank you. Again, I do believe it's a one-page decision that basically says, it does say, not basically, it says the contribution of their counsel is too small to warrant a fee award. I actually do respect Judge Chobrier, who I respect a lot and have cases before. I think that ruling in and of itself is almost an abuse of discretion. But I think when you look at the record, you see it is an abuse of discretion. Thank you. Do you want to reserve the balance of your time? Thank you, Your Honor. I spoke more than I wanted to, but hopefully I answered correctly. Good morning, Your Honors. Derek Lozier for the settlement class from Killerobeck. And before responding directly to Mr. Audet, I do think it would be useful to talk a little bit about the settlement just to orient ourselves here to consider what it is exactly that Mr. Audet thinks that he improved. And, you know, this case took a long time to negotiate, and these were painstaking, difficult negotiations. We had the assistance of professional mediators, including Ms. Julius in this courthouse and Lane Phillips, and the district court was very actively involved. He referred, Judge Chobrier referred to his involvement as more than normal scrutiny and rigorous scrutiny, and the record clearly shows that. And this is the Wells Fargo unauthorized account case that obviously became a front-page news case. But as Judge Chobrier noted on several occasions, the monetary damages suffered by the class in this consumer case were relatively modest and extremely complicated to sort out in a remedy. But that is precisely what this settlement accomplishes. There are three major types of relief that are provided, each one of which required extensive negotiations and the assistance of the mediators. It's a make-whole settlement. In fact, it's a more-than-make-whole settlement. The class recovers all of their out-of-pocket losses, and then there's a residual payment as well that's geared to the number of unauthorized accounts each person has. It is a uncapped guarantee of compensatory losses, meaning that if the formulas that we developed, which again took an extreme amount of time and expert assistance to develop, result in Wells Fargo using up the entire settlement fund to pay out the damages that the settlement requires, then Wells Fargo has to put in more money. The settlement also shifts all risk of uncertainty to Wells Fargo, meaning that if our estimates of the number of class members prove to be wrong, then Wells Fargo has to adjust the only part of the settlement that can be affected by that, and that's the $25 million reserve. So it is a settlement that sought to actually solve the problem that this difficult case presented, and that is what do you do with a scandal that affects thousands and hundreds of thousands of people that subjects them to relatively modest damages, but for some people the damages might be quite significant. Those would be the people with the credit injury, and the settlement is geared around in a first-of-its-kind type of relief to pay people directly and individually for the credit damages that they themselves have incurred. So that is the settlement in a big picture. Judge Chabria scrutinized this settlement very, very carefully. As anyone who's been before Judge Chabria knows, he always does with class action settlements. And so here today Mr. Audet is asking the court to find that Judge Chabria abused his discretion when he determined that Mr. Audet and his firm's contribution to the settlement was too small to warrant a fee. Now, of course, it's an abuse of discretion standard, as Judge Gould noted, and the record clearly shows that Mr. Audet had his opportunity to explain why he thinks he improved the settlement, and the judge disagreed with that. And with all due respect to Mr. Audet, he is like the person at the Bears game yelling out to the quarterback. There was information over the course of this negotiation that became public. There was testimony at Congress. There were things that Wells Fargo released, and we were always incorporating that information into the settlement and taking it into account. Mr. Audet was not involved in any of the settlement negotiations. He showed up 18 months after the case was filed, after a preliminary settlement was already reached, and hard-fought negotiations were ongoing. And he sent us a lot of letters and e-mails, and he sent Wells Fargo the same. And at the conclusion of that, he asked the district court for $4.26 million in fees, which after our opposition to that, he reduced to $1.3 million. So that's the backdrop. And I think what's really important is where – is what Judge Gould noted, which is the abuse of discretion standard. Judge Chabria carefully considered what it is that Mr. Audet claimed he did, and he disagreed with Mr. Audet. And there's nobody in a better position in this case than Judge Chabria to understand the contributions that Mr. Audet and his firm made. Now, on this $25 million reserve question, I think that's a good specific place to start. Of course, we were well aware, because it was public, that Wells Fargo had indicated that its earlier estimates of the number of unauthorized accounts may have been wrong. And in fact, what Wells Fargo did was they refined their analysis and they analyzed for a longer period of time. But we were very concerned about that, because the portion of the settlement that could be affected by that, which is the noncompensatory damages, you could result in some dilution to the pro rata amount that each person would get. So we immediately started negotiating with Wells Fargo to solve that problem. Now, the record very clearly shows that what Mr. Audet is saying is not true. He sent a letter, which he identifies as having occurred on September 14, 2017, and yet we became aware of this problem in August.  And it really had nothing to do with Mr. Audet. He also, and I certainly agree that he's waived these arguments by not making them, but as to the $25 million reserve itself, he's now claiming that he had something to do with that. That reserve was not the result of this later revision. That reserve was made part of the settlement back in June of 2017. So obviously his September letter couldn't have led to the creation of the reserve or led to the adjustments to the reserve. Help me understand your argument about this claims period, please. It seems like you specifically proposed that the deadline to file a claim be extended in light of the objection and that extended deadline became part of the settlement. I guess I'd just like to ask you why wasn't that a substantial benefit to the class? Here's the answer to that. You're correct that Mr. Audet complained about the 120 days, which was in the initial preliminary approval papers. The problem that Mr. Audet has is that he tried to explain to the Court that he was the reason why the claims deadline extended, was extended, and the Court didn't agree with that. Did not consider his contribution to that as justifying a fee. And, you know, the Court is in the best position, not Mr. Audet, to understand why the claims deadline was changed. And the Court itself expressed an interest in more time both before preliminary approval, during preliminary approval, and after preliminary approval. And so the Court made a decision based upon, we think, his own view of the fact that there would need to be more time and he would have changed the deadline anyway. Well, how do we know that? Well, I guess the question is, how do we know that Mr. Audet is the reason that the deadline was changed by the Court? I asked you first. How do we know that he wasn't? Because I don't think Judge Chabria explained this. What I think you can infer from the record, which of course you're allowed to do, is Judge Chabria expressed interest in more time, more time to evaluate credit impact damages, more time so that more people could submit claims. And we can infer from his own statements of interest in more time. When did he – when did Judge Chabria express that and then why didn't – I mean, can you – did you respond to his concern in doing that or – because it seems like the timing was – might have been related to the objection. I'm just trying to figure out here why you're saying that it would have happened anyway because it seems – that seems kind of speculative, if that's what you're saying. First of all, what Mr. Audet is saying is speculative as well in that he's saying he knows why the judge changed the deadline and he does not. But the reason why he wasn't – But he made – he did offer the additional time in the form of an objection, did he not? Yes, he did. Okay. So he can point to something. I'm trying to figure out what you can point to. I would point to Chernavsky, the SER record 185 and 186, which is the order requiring further briefing for preliminary approval hearing in which the court noted a desire to have more time. There's SER 682 and 683, which is the second order before preliminary approval identifying topics for discussion at the hearing, which included wanting to have more time to evaluate the credit impact damages. Right. But were those – were those indications from the district court made before or after the objection was filed? The – they were made after Mr. Audet's initial objection was filed. So at least he has the timing right. On this particular claim, at least he has the timing right. And we have not said that Mr. Audet didn't propose this. What we're saying is that it's the district court judge who's reviewed for abuse of discretion who knows better what influenced his decision-making. And when Mr. Audet said, I'm entitled to a fee because I proposed this, the district court judge did not agree with that. Right. But, I mean, but if Judge Chabry had written an opinion, not even an opinion, just a short order saying, yes, Mr. Audet recommended 150 to – extending it from 150 to 210 days, but I would have done that anyway. So he didn't really bring anything to the table. Then I think that's entitled to abuse of discretion review because the judge is telling us exactly what he was thinking. But we – we don't have that here. That's – that's correct. He did not specifically address this or many other of the objections of Mr. Audet's that were overruled or that Mr. Audet subsequently abandoned. However, his decision in denying the fee is entitled to abuse of discretion. And as this Court has noted many times, the district court was in the best position to evaluate each firm's contribution. And Mr. Audet, of course, had the time and opportunity to explain his contribution, made this exact argument to the district court, and didn't persuade him. There's two other things to keep in mind about what Mr. Audet is claiming. The first is that he goes through the numbers in his brief at some detail to show – to attempt to show that he's responsible for all the additional people who were able to file claims because of the initial extension. And there's two – two quick things I want to point out about that. The first is that there actually were two extensions in this case. The second one had nothing at all to do with Mr. Audet. We were contacted by a number of the attorneys general who had – conducting their own investigation, and they wanted more time for more people to submit more claims. And we had no problem with that, as was always the case when people proposed there should be more time. And so there was a second 155-day extension that moved the deadline from February to July. And that, of course, has nothing to do with Mr. Audet. And then the last point on this that I think is worth mentioning is that the premise that Mr. Audet has here is not just that he had something to do with changing the deadline, which, you know, he certainly did send his letter suggesting that. It's that because of that change, he is the reason why hundreds of thousands of other people filed claims. And the reality is deadlines matter, and we don't actually know what people would have done if the deadline had never changed. And it's entirely speculative to say that one way or the other how many more people filed more claims. I think that's another reason why the judge's decision here was a judgment call that Judge Chabria made. The benefit itself, it's not enough to just have a benefit. Extending the deadline is a benefit. It needs to be a substantial benefit. But it looks like in the reply for preliminary approval of the settlement, Jabari, that's your client, correct? Correct. All right. Specifically said it was proposing an extended claims deadline, quote, in light of Chernofsky's objection. Yes. There's no question. This is at ER-448. That is correct. And it is not our position that Mr. Audet did not suggest an extension, nor that we didn't look at that. And as requested, we didn't fight about it. We were perfectly happy to extend the deadline. The question is not whether the initial deadline, our proposal, was because of Mr. Audet. The question is whether the district court judge, when deciding to extend the deadline, did so and would have done so anyway, or did he only do it because Mr. Audet proposed it. And, again, we think it's Judge Chabria who's in the best position to answer that question. And it's speculative to assume that he only extended the deadline because of Mr. Audet's proposal. Well, he probably, Judge Chabria probably did it because you suggested it, right? I'm sure he took that into account. But he also expressed his own interest in having more time repeatedly, repeatedly. He wanted more time to evaluate the claims. He wanted more time to evaluate credit impact damages. And, again, it's Judge Chabria who knows why he extended it. And if he believed that Mr. Audet was the reason and the sole reason, which is what the law requires, then presumably he would have done something about that. But the question here is was there a substantial benefit and was Mr. Audet solely responsible for it? And the judge did not think that was the case. And I think his judgment call on that is entitled to deference. Counsel, Judge Gould, if I could ask you one question, please. And I'll apologize if I didn't know this from the record, but I assume you will. Did anyone, any party, ask the judge to elaborate on his church statement denying the objector claims? Not to my knowledge. I don't believe Mr. Audet ever filed something asking for a more robust explanation for the denial of his request for fees. I think that the judge was there. He had a front-row seat. He evaluated the circumstances. And the record supports his decision. And there was something in the Court's recent Hyundai decision that I think sums up this situation very, very well. And if I may, I'll just read that and then see my time is up. What this Court wrote was the District Court, which had ably managed this complex litigation for several years and observed various counsels' performance during numerous hearings and through extensive briefing, was in the best position to evaluate each firm's contributions. And I believe that is precisely the case here as well. Thank you. Thank you. Your Honor, I have nothing to add except hopefully have a nice day and hopefully have a nice visit to California, unless you have any questions. No, thank you very much. Thank you. No questions. All right. Mr. Lozier and Mr. Audet, thank you very much. Jabari v. Alex Chernovsky v. Wells Fargo is submitted.
judges: Gould, Murguia, Feinerman